# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **FILED UNDER SEAL PURSUANT TO ORDER** |
| v. | ) | Case No. |
| | ) | 13-mj-812 FLN |
| KEITH MICHAEL NOVAK, | ) | |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about November 4, 2013, in Ramsey County, in the State and District of Minnesota, the defendant

committed fraud and related activity in connection with identification documents

in violation of Title 18, United States Code, Section(s) 1028(a)(7).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Complainant's signature

MARC RENSCH, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 12/11/13

_____
Judge's signature

City and state: Minneapolis, MN

The Honorable Franklin L. Noel, U.S. Magistrate Judge
Printed name and title

SCANNED
DEC 11 2013
U.S. DISTRICT COURT MPLS

STATE OF MINNESOTA    )
                      )    ss.   AFFIDAVIT OF MARC A. RENSCH
COUNTY OF HENNEPIN    )

I, Marc A. Rensch, being duly sworn, depose and state as follows:

## INTRODUCTION

1.     Your Affiant is a Special Agent with the Federal Bureau of Investigation (FBI) and has been so employed since 1999. I have been assigned to the Minneapolis Division of the FBI since completing my training as a new agent. As a Special Agent of the FBI, my duties and responsibilities include conducting investigations of individuals and entities for possible violation of Federal Laws, particularly those laws found in Title 18 and Title 21, United States Code (U.S.C.). As an investigator and law enforcement officer of the United States your Affiant is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code Section 2516.

## PURPOSE OF THE AFFIDAVIT

2.     This Affidavit is made in support of an application for an arrest warrant for Keith Michael NOVAK and search warrants for two residences and one vehicle used by NOVAK (hereinafter, referred to collectively as "the SUBJECT PREMISES"). The SUBJECT PREMISES are described in greater detail in paragraph 6 below and in Attachments A-1, A-2 and A-3 to the search warrants.

3.     I believe searches of the SUBJECT PREMISES will yield evidence of violations of Title 18, United States Code Section 641, Theft of Government Property; Title 18, United States Code Section 1028, Fraud and Related Activity in Connection with Identification Documents; and Title 18, United States Code Section 793, Gathering,

Transmitting or Losing Defense Information.   The items to be seized are further described in Attachment B to each search warrant.

4.      As stated above, this affidavit is also made for the purpose of establishing probable cause in support of a federal arrest warrant for Keith Michael NOVAK.  Based upon all the facts and information set forth in this Affidavit, your Affiant believes that probable cause exists to believe that, on or about November 4, 2013, in Ramsey County, Minnesota, in the State and District of Minnesota, NOVAK knowingly transferred, possessed, and used without lawful authority, a means of identification of another person with the intent to commit, and to aid and abet, and in connection with, any unlawful activity that constitutes a violation of Federal law, in violation of 18 United States Code Section 1028(a)(7).

5.      The facts and information contained in this Affidavit are based upon my own investigation and observations and those of other agents and law enforcement officers involved in the investigation.  All observations referenced below that were not made by me were related to me by the persons who made such observations.  This Affidavit contains information necessary to support probable cause for the attached Application.  It is not intended to include each and every fact and matter observed by me or known to the Government.

## PREMISES TO BE SEARCHED

6.      Based upon my personal observations and information received from other investigators, the SUBJECT PREMISES are more particularly described as follows:

a.    **SUBJECT PREMISES 1** is a residence located at 2637 Stillwater Road East, Apartment 3, Maplewood, Minnesota. **SUBJECT PREMISES 1** is NOVAK's primary residence. No other individuals are believed to be permanent residents of **SUBJECT PREMISES 1**.[1]

b.    **SUBJECT PREMISES 2** is a residence located at 3640 Togo Road, Wayzata, Minnesota. These premises are owned by NOVAK's father, Michael Daniel Novak, who also resides there. NOVAK's address of record on file with the Minnesota Army National Guard is **SUBJECT PREMISES 2**.

c.    The **SUBJECT VEHICLE** is a Maroon 1994 GMC Sierra Pickup, bearing Minnesota license plate VUA 208 and Vehicle Identification Number 2GTEK19KXR1557834.[2] This vehicle is registered to Kevin Nelson Jahnz, 2625 132nd Court W., Rosemount, Minnesota, but is utilized exclusively by NOVAK.

### STATEMENT OF PROBABLE CAUSE

7.    Based on my review of reports prepared by FBI agents, Department of Defense records, and other official records, I know the following:

---

[1] It is believed that NOVAK's brother, R.R., spends the night on NOVAK's sofa at **SUBJECT PREMISES 1** during the work week.

[2] The **SUBJECT VEHICLE** has been the subject of a court-authorized tracking device since May 13, 2013.

a.      NOVAK is a member of the Minnesota Army National Guard. His present Military Occupation Specialty ("MOS") is "35M", which is Human Intelligence Collector.   NOVAK joined the Minnesota Army National Guard on or about September 3, 2012.

b.      Prior to joining the Minnesota Army National Guard, NOVAK was an Active Duty Soldier assigned to the 82nd Airborne Division, located at Fort Bragg, North Carolina. He served on Active Duty from February 26, 2009 until September 3, 2012.   At the time, his MOS was "35F", Intelligence Analyst. While on Active Duty, NOVAK served in Iraq from January 3, 2010 to August 6, 2010.

c.      When NOVAK joined the Minnesota Army National Guard, there were no slots available for his previous MOS, so NOVAK was given an MOS transfer to 35M. To facilitate this transfer, NOVAK was sent to specialized training at Camp Williams, Utah, to attend the "35M10 Human Intelligence Collector MOS Qualification" course.   This course was conducted in several phases of instruction which included instruction on "Interrogation Operations of the Human Intelligence," "Military Source Operations of the Human Intelligence Collector," and "Tactical Operations."   Instruction began on or about January 23, 2013, and concluded on April 7, 2013.

d.      On June 1, 2009, NOVAK signed a SF-312 Classified Information Nondisclosure Agreement.

e.      NOVAK is also a member of a Minnesota militia organization and is self-described as a "commander" in the militia.  This is not a military unit of the United States, the State of Minnesota or any other government entity.

## NOVAK OFFERS TO PROVIDE STOLEN NATIONAL SECURITY INFORMATION TO THE UCEs.

8.      Based on my review of reports prepared by FBI agents, my discussion with two FBI Undercover Employees ("UCEs"), and other law enforcement personnel, I am aware that NOVAK met the two UCEs in Utah.  At the time of these meeting, NOVAK was undergoing specialized Counterintelligence Training at Camp Williams, Utah, as a member of the Minnesota National Guard.  At the time of this meeting, I am aware that the UCEs introduced themselves as members of a Utah-based militia.  From my review of the case materials, I am aware of the following specific events:

a.      During a meeting with the UCEs on March 21, 2013, NOVAK described his "intelligence collection methodology" and extended an invitation to the UCEs to visit him in Minnesota where he would provide them training on various military intelligence-related tasks, including the creation of "target packages" and the effective conduct of "interrogations."

b.      During a second meeting with the UCEs on or about March 24, 2013, NOVAK described how he removed classified material from Fort

Bragg, North Carolina, when he was assigned to the 82nd Airborne Division. NOVAK stated that when the UCEs visited Minnesota, NOVAK would provide them with a copy of the classified document, but stated that he wanted to retain the original. NOVAK stated that he had also provided the classified material to an unnamed associate in Minnesota.

c.     On June 12, 2013, in a consensually recorded telephone call between UCE 1, NOVAK and UCE 1 agreed to meet in Minnesota.

### AT *SUBJECT PREMISES 1*, NOVAK PROVIDES STOLEN NATIONAL SECURITY INFORMATION TO THE UCEs.

9.     Based on my review of reports prepared by FBI agents, my discussion with the two UCEs, and other law enforcement personnel, and my review of recorded statements made by NOVAK, I am aware of the following:

a.     The two UCEs traveled to Minnesota in July 2013, in order to meet with NOVAK as previously arranged.

b.     On or about July 23, 2013, NOVAK met the UCEs at a Perkins Restaurant located in Woodbury, Minnesota. Immediately following the meeting at Perkins, NOVAK and the UCEs walked to a nearby Target store where the UCEs, at NOVAK's suggestion, purchased a high resolution digital camera. According to NOVAK, the camera was needed to facilitate the imaging of the classified material NOVAK told the UCEs he had in his possession and would provide a copy to them.

6

c.    Following the purchase of the camera, the UCEs and NOVAK traveled in their respective vehicles to **SUBJECT PREMISES 1**.   At **SUBJECT PREMISES 1**, NOVAK produced the previously discussed classified material from his bedroom and provided it to the UCEs.   The UCEs then used the newly purchased camera to take digital photographs of the classified material.   NOVAK then transferred these images first from the camera to NOVAK's computer, then from the laptop computer onto two electronic media storage devices.

d.    NOVAK stated to the UCEs during this process that he could get a "life sentence" in prison if caught with the classified material.

e.    NOVAK maintained possession at **SUBJECT PREMISES 1** of the classified material, his laptop computer, and one of the electronic media storage devices containing the digital photographs of the classified material. He provided the other electronic media storage device containing the photographs of the classified material to the UCE's.

f.    NOVAK instructed the UCEs how to encrypt the media storage device using a commercial open-source encryption program called "TruCrypt."

*AT **SUBJECT PREMISES 1**, NOVAK ADMITS TO THE UCEs THAT HE TOOK*
*PERSONALLY IDENITIFIABLE INFORMATION BELONGING TO SOLDIERS*

10.    During the July 23, 2013 meeting at **SUBJECT PREMISES 1**, NOVAK showed to the UCEs a document which NOVAK stated was a personnel roster, or

"SCARS"[3] for the military unit to which NOVAK was assigned while on active duty and stationed in Fort Bragg, North Carolina.   This document contains the means of identification, including Personally Identifiable Information ("PII") such as the full names, dates of birth, places of birth, Social Security numbers, military ranks, security clearance levels, and types of clearance investigation, for approximately 400 members (a "Battalion's-worth of people" according to NOVAK) of the military unit.   NOVAK stated to the UCEs the following:

     a.     NOVAK introduced the "SCARS" document to the UCE's by asking them if they "ever wanted to disappear and become someone else" the SCARS roster listed "a Battalion's worth of people" whose identity could be used for this purpose.

     b.     The UCEs convey their interest to NOVAK in obtaining this information and indicate they have a source who can make fake identity documents with the information possessed by NOVAK.

     c.     When the UCEs asked NOVAK if needed a fake identity, NOVAK replied in the affirmative.

*NOVAK PROVIDES SOLDIERS' PII TO THE UCEs SO THAT FALSE MEANS OF IDENTIFICATION WILL BE MADE FOR HIS MILITIA ASSOCIATES.*

     11.    On or about August 28, 2013, NOVAK met UCE 1 at **SUBJECT PREMISES 1.** From my review of reports prepared by FBI agents, my discussion with

---

[3] NOVAK describes the "SCARS" document to the UCEs as a "Sensitive Compartmentalized Access Roster."

UCE and other law enforcement personnel, and my review of recorded statements made by NOVAK, I am aware of the following:

   a.   NOVAK installed on UCE 1's laptop the same form of encryption that NOVAK himself used and told the UCE 1 he would begin transmitting encrypted communications to the UCE 1 via e-mail.

   b.   NOVAK then transmitted an encrypted e-mail message to the UCE 1's e-mail account that contained an encrypted file of an image of a Minnesota Driver's License and social security card of a female.

   c.   NOVAK explained to the UCE 1 that the female was unknown to him and NOVAK recovered the female victim's personal information from a used computer hard drive NOVAK had obtained.   NOVAK told UCE 1 the female victim's means of identification could be used by the UCE 1 as partial payment for the UCE 1's manufacture of false identification for NOVAK.

   d.   NOVAK further stated he planned to begin transmitting the "SCARS" document and militia member photographs to the UCE 1 so that the UCE 1 could facilitate the production of false identifications for the militia members.

   e.   NOVAK also informed the UCE 1 that he was in possession of a $2,000 antenna that he "stole from the Army" and "kept in storage." NOVAK described the antenna as a "6 meter rig".

12.     On September 23, 2013, NOVAK transmitted via e-mail to UCE 1 the means of identification of seven individuals from the "SCARS" document. NOVAK provided these means of identification for the purpose of creating false identification documents for himself and members of his militia.

13.     On September 28, 2013, NOVAK and members of his militia group conducted a military-style Field Training Exercise ("FTX") in rural Minnesota. At NOVAK's invitation, the UCEs attended portions of this FTX. During the FTX, NOVAK spoke to the UCEs about NOVAK's continued interest in providing means of identification from the "SCARS" document to be used in the fabrication of false identification cards. The UCEs indicated to NOVAK that the means of identification from the "SCARS" document were of value in fabricating false identification cards beyond just those for NOVAK's militia members, and NOVAK affirmed his interest in receiving financial compensation in exchange for providing the information to the UCEs. The UCEs offered NOVAK $50 per identity. NOVAK agreed and suggested that funds derived from such an exchange could be used to expand NOVAK's radio communications capability. NOVAK cautioned the UCEs that other members of his militia group were "in the dark" about the false identification scheme.

14.     In an October 27, 2013 consensually recorded telephone call between a UCE 1 and NOVAK, NOVAK referenced his continued interest in providing the means of identification from the "SCARS" document to UCE 1 in exchange for financial compensation.

15.     On November 3, 2013, in a consensually recorded telephone call between a UCE 1 and NOVAK, NOVAK advised the UCE 1 that he would soon be transmitting to UCE 1 via e-mail approximately 40 sets of means of identification from the "SCARS" document.

16.     On November 4, 2013, NOVAK transmitted via e-mail to UCE 1 the means of identification - including social security numbers and dates of birth - of 44 individuals from the "SCARS" document.

17.     During a November 25, 2013 meeting at **SUBJECT PREMISES 1,** NOVAK accepted the previously agreed upon amount of $2000.00 from the UCEs for the means of identification of the 44 individuals provided on November 4, 2013.  Further, on November 25, 2013, NOVAK described having destroyed the physical copies of the SCARS document, but saved a digital version of the SCARS document in a "really good spot" that "can never be found".  NOVAK added that he still has 5 or 6 pages of the SCARS document that he was willing to sell in the aforementioned manner.

*THERE IS PROBABLE CAUSE TO BELIEVE NOVAK STORES STOLEN GOVERNMENT PROPERTY AT SUBJECT PREMISES 2*

18.     On November 15, 2013, a CHS[4] accompanied NOVAK to a commercial storage facility where NOVAK had access to a storage unit.  Although the CHS

---

[4] The CHS served with NOVAK in the 82nd Airborne Division while deployed to Iraq. The CHS trained NOVAK's militia unit on one occasion.  The CHS does not self-identify as a member of NOVAK's militia or of any other militia movement.  The CHS has no known criminal history.   The CHS believes that NOVAK likely engaged in an inappropriate romantic relationship with the spouse of a friend of the CHS.

accompanied NOVAK to the storage unit NOVAK controlled, the CHS does not recall the exact number of the storage unit. NOVAK told the CHS that the storage unit contains six "flak vests," and that NOVAK had previously given 10 other "flak vests" to members of his militia group. According to NOVAK, the flak vests are the property of the U.S. Army's 82nd Airborne and were taken by NOVAK while they were left unattended at Fort Bragg to dry out. NOVAK stated that he has a lot of equipment stored at **SUBJECT PREMISES 2** to include: "radio reflective camouflage netting" and "riot gear" taken from the U.S. military. NOVAK also advised the CHS that NOVAK intends to start burying caches of equipment and he has prepared "gear bags" at his apartment **(SUBJECT PREMISES 1)** to issue members of his militia group.

19.    Information obtained as a result of a Court-ordered vehicle tracking device on the **SUBJECT VEHICLE** showed that on November 27, 2013, two days following the meeting with the CHS, NOVAK went to **SUBJECT RESIDENCE TWO** and his storage unit. NOVAK previously demonstrated this same pattern of visiting **SUBJECT RESIDENCE TWO** and his storage unit using the **SUBJECT VEHICLE** shortly after the July 23, 2013, meeting with the UCEs.

*THERE IS PROBABLE CAUSE TO BELIEVE THAT A SEARCH OF THE **SUBJECT VEHICLE** WILL YIELD EVIDENCE OF VIOLATIONS OF TITLE 18, U.S.C. SECTIONS 641, 793, and 1028*

20.    Based on my review of reports prepared by FBI agents, my discussion with two FBI Undercover Employees ("UCEs"), and other law enforcement personnel, I believe there is probable cause to believe that a search of the **SUBJECT VEHICLE** will

yield the evidence sought be this application.   Specifically, NOVAK has used the **SUBJECT VEHICLE** in the following manner:

      a.     NOVAK has previously indicated that the **SUBJECT VEHICLE** is used as a "command post" during FTXs that he leads.

      b.     During the September 28, 2013 FTX (see para. 13) NOVAK utilized the **SUBJECT VEHICLE** to provide transport for militia group members to the location.   The **SUBJECT VEHICLE** was also used by the militia group to practice vehicle assault tactics and as a platform for other militia training exercises.   The **SUBJECT VEHICLE** also served as NOVAK's private space where NOVAK could discuss matters with the UCEs away from his militia group members.

      c.     On November 14, 2013, NOVAK provided the CHS a radio communications demonstration inside the **SUBJECT VEHICLE**.   The CHS observed that NOVAK utilized a cellular telephone and his laptop computer as part of his radio system to encrypt audio and data communication transmissions.

      d.     During a November 25, 2013 meeting between the UCEs and NOVAK in the **SUBJECT VEHICLE**, NOVAK reiterated that the radio communications system in the **SUBJECT VEHICLE** utilized a cellular telephone and laptop computer to encrypt audio and data communication transmissions.

## BACKGROUND REGARDING SEIZURE OF COMPUTER EQUIPMENT

21.     The records, documents, and /or materials listed on the attached "List of Items to Be Seized" may be in the form of paper or stored in the form of magnetic or digital coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. I know that these items, including computer hardware, software, documentation, passwords, and data security devices, may be important to a criminal investigation in two distinct and important respects: (a) The objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (b) the objects may have been used to collect and store information about crimes in the form of electronic data. Specifically, there is probable cause to believe that information related to this investigation is being stored on specific computers, currently being held inside the **SUBJECT PREMISES,** as indicated above. Based on your affiant's training and experience, I know that computer, hardware, peripheral devices, software, electronic files, documentation, and encryption/passwords are integral to NOVAK's ability to accomplish his crimes.

22.     Rule 41 of the Federal Rules of Criminal procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices that are (1) instrumentalities, fruits or evidence of crimes or (2) storage devices for information about crime. The attached "List of Items to Be Seized" requests permission to search and seize records and documents relating to identity theft fraud, access device fraud, theft of government property (including national security

14

information) and transmitting national security information by the subject named herein and the aforementioned entities under his control and ownership, including those that may be stored in electronic format. This affidavit also requests permission to seize the computer hardware (and associate peripherals), including any laptop computers that may contain records and documents if it becomes necessary for reasons of practicality to remove the computer hardware, software, or other electronic storage device and conduct a search off-site. As discussed below, every effort will be made to image electronically stored data without removing computer hardware, software, or other electronic storage devises from the premises described herein. However, if the volume of electronic data makes on-site imaging impracticable, your affiant asks permission to conduct such imaging off-site and return the hardware, software, or other electronic storage devices to the respective owners expeditiously. Therefore, your affiant asks permission to conduct such imaging off-site and return the hardware, software, or other electronic storage devices to the respective owners expeditiously.

23.     During the execution of this search warrant, computers will be imaged on-site as long as time permits. Your affiant will be executing the search warrants with a team of Special Agents/computer Investigative Specialists who have received special training in securing, handling and authenticating electronic evidence. The agents utilize special software and equipment to capture the contents of hard drives and other forms of media. These images will be verified on-site to insure that the images are functional and

access to the data can be gained. Also the selected programs and data files may be copied from the servers for subsequent analysis.

24.     Based on my knowledge, training and experience in the execution of previous search warrants, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

      a.     The volume of evidence. Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in a random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which files are evidentiary or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

      b.     Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search

protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.

25.    Based on my knowledge, training, and experience, and consultation with FBI Computer Analysis Response Team ("CART") examiners, I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following: The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output ("I/O") devices in order to read the data on the system. It is important that the analyst be able to properly reconfigure the system as it now operates in order to accurately retrieve the evidence listed below. In addition, the analyst needs the relevant system software, (operating systems, interfaces, and hardware drivers) and any applications' software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

26.    As a result of the foregoing, the Court's permission is requested to seize the computer hardware (and associated peripherals) that are believed to contain some or all

of the evidence described in the "List of Items to Be Seized" and to conduct an offsite search. The amount of electronic media, technical issues, encrypted data and unique equipment/software may impact on the exact amount of time that it may require to acquire and test images, both on-site and off-site. It will be the Special Agent/computer Specialist's objective to conduct this activity in the least obtrusive manner, while insuring the acquisition of the evidence for which this warrant has been issued. If, after inspecting the system's electronic storage media, peripheral devices, software, documentation, and data security devices, the computer specialist determines that these items are no longer necessary to retrieve and preserve the electronic, the government will return them with a reasonable time. If this off-site imaging and testing is necessary, it will be conducted imperiously and once the images have been verified as usable, the seized items will be returned to the respective owners.

## REQUEST FOR SEALING AND DELAYED NOTIFICATION

27.   Rule 41(f)(3) of the Federal Rules of Criminal Procedure, authorizes a magistrate judge, upon the request of the government, to delay any notice required by Rule 41 if the delay is authorized by statute.  Title 18, United States Code, Section 3103a(b), authorizes the Court to delay the notice requirements if:  (1) the Court finds reasonable cause to believe that providing immediate notice of the warrant may have an adverse result; (2) the warrant prohibits the seizure of any property or the Court finds reasonable necessity for the seizure; and (3) the warrant provides for the giving of notice

within a reasonable period not to exceed 30 days after the date of its execution, or on a later date certain if the facts of the case justify a longer period of delay.

28.     In this case the investigation is ongoing, and as noted above, NOVAK is involved in illegal activity and is using multiple residences, at least one storage location and a vehicle registered in another's name, perhaps to evade detection by law enforcement. More concretely, NOVAK has sought to obtain a means of identification in the name of another for his use and use of his militia associates.

29.     Further, NOVAK has made several statements that suggest that if he learned of the existence of this application, he might flee, resort to violence, or both. Among the statements he has made are the following:[5]

a.      When providing a brief tour of **SUBJECT PREMISES 1** to UCE 1 on July 23, 2013, NOVAK described his actions if law enforcement would seek to arrest him at **SUBJECT PREMISES 1**:

> NOVAK: Whenever I am working on something, I always keep this window open, 'cause if I hear my fucking door get kicked, I'm going to slide over here real quick, say dismount all, start shooting through the fucking wall.

> UCE: That's perfect too, because that's the hallway.

> NOVAK: I always, I always set up my living areas like that. Like there how my bed is, I've my AK in my bed. If I hear that door kick, it's going boom, boom, boom, boom, boom, boom, I'm just going to start putting them through the fucking wall. Then I'm going to fucking, as I hold them off, I'm going to get on the radio.

---

[5] The statements below are DRAFT transcriptions of the recorded conversations between NOVAK and the UCEs. The FINAL versions of these transcriptions have not been completed and may vary in some small detail from the DRAFT transcriptions.

Another reason that I have all those rucksacks there, I can throw them against the door. Well, also 'cause I'm still working on them. Barricade myself, call my guys, have them show up.

UCE: Can they get here fairly quick?

NOVAK: Yeah, oh, yeah. I mean, I'd probably have to hold off the fucking Mossad or whatever for about 30, 40 minutes, but that's not a problem, I've got something, 5000 rounds, a thousand of it is in magazines, ready to go.

NOVAK: That's to the back way, it just goes down the stairs out the back. We're second floor back here, first floor in the front, that's what's kind of nice, no one's getting through my windows because it's second floor back here. And I also have an escape route that I don't think many people would know, would know of.

- - -

NOVAK: I sleep with both of these [guns], so it's like if someone came through my door, it's all over in that little fatal funnel I've got through there. If I'm sleeping here, if I'm sleeping in my room, I'll shoot through the wall, they'll be tight as shit. Yep, dead to rights, yep, they're not going to have a good time coming through here.

b.     During a conversation with UCE 1 on August 28, 2013, NOVAK stated that he has weapons hidden throughout the state: "All I need to keep like is my handguns and one of my rifles with me in my kit when I'm training for if I have to react where I am. I have all these other ones hidden throughout the state. If I ever got rolled up and let go without my weapons I'd be able to get them or if I got rolled up in the state."

c.     NOVAK also has stated to the UCEs that he frequently carries a handgun concealed on his person, despite knowing it is unlawful to do so without

a permit. The UCEs have observed NOVAK carry a concealed weapon. For example, on August 28, 2013, NOVAK stated to UCE 1, "You saw my little 9. That's for when I have to go to drill [duty with the Army National Guard] and shit. I've got that for deep carry."

      d.    During a conversation with UCE 1 on September 28, 2013, NOVAK again reiterated the danger facing law enforcement officers would face if they attempted to enter SUBJECT PREMISES 1 and reinforces the fact that he has weapons hidden elsewhere:

> UCE: Your place is set up pretty well Keith. That would be tough to get into.
>
> NOVAK: Are you talking the first floor in the front, second floor in the back type thing?
>
> UCE: Coming in through your front door would be a pain in the ass.
>
> NOVAK: Oh yeah, the nice fatal funnel I've got going on there. Yeah, yeah. The place holds no val...sentimental...that's the whole thing, you can't think that you can sit there and win a defensive fight, you know. It's an expendable place to me. I get what I need and I get out. The only thing that matters is the ruck on my back and the rifle in my hands at that point. A lot of people get caught up in that "oh, I've been paying for this home for this many years, I can't". No man, it's you life here, you're not going to win this defensive fight. Depending on...if the feds are knocking on your fucking door what are you going to do, fight them off and live happily                    ever                    after?
>
> UCE: Yeah, they're going to keep coming. Look at Waco.
>
> NOVAK: You got to burn your fucking way out of there, have friends on the other side helping you and get going.
>
> UCE: Get going.

> NOVAK: They'll still get a chest full of fuckin' lead, but in the event, in the event that they manage to nab me, they're only going to get one rifle and a pistol. Everything else is going to be somewhere else, you know what I mean? Everything else is going to be waiting for me to go and get back.

30.    Therefore, there is reasonable cause to believe that providing immediate notice of the application and order will likely result in the destruction of evidence, flight of target of this investigation, and the great risk of harm to the law enforcement officials and the community at large.   Accordingly, there is reasonable cause to believe that disclosure of the contents of this affidavit and the warrant and associated documents would, in your Affiant's opinion, jeopardize the ongoing investigation and hinder the opportunity to pursue leads developing out of the current investigation.

## CONCLUSION

31.    Based on the facts set for the above, and based on my training, experience, knowledge, and the aforementioned facts of this investigation, I believe there is probable cause to believe that Keith Michael NOVAK has committed criminal offenses against the United States, including violations of Title 18 U.S.C. 1028(a)(7). I further conclude that there is probable cause to believe that evidence, fruits, and or instrumentalities of the offenses described in paragraph 3 can be found at:

a.    **SUBJECT PREMISES 1** located at 2637 Stillwater Road East, Apartment 3, Maplewood, Minnesota, as further described in Attachment A-1 to the search warrant.

    b.    **SUBJECT PREMISES 2** is a residence located at 3640 Togo Road, Wayzata, Minnesota, as further described in Attachment A-2 to the search warrant.

    c.    The **SUBJECT VEHICLE** is a Maroon 1994 GMC Sierra Pickup, bearing Minnesota license plate VUA 208 and Vehicle Identification Number 2GTEK19KXR1557834, as further described in Attachment A-3 to the search warrant.

FURTHER YOUR AFFIANT SAYETH NAUGHT

Marc A. Rensch
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before

me this 11th day of December, 2013.

The Honorable Franklin L. Noel
United States Magistrate Judge