## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 14-44 (PJS) |
| vs. | ) | |
| | ) | |
| KEITH MICHAEL NOVAK, | ) | |
| | ) | |
| Defendant. | ) | |

## KEITH MICHAEL NOVAK'S
## POSITION REGARDING SENTENCING

## INTRODUCTION

Keith Novak ("Novak") is a young man whose difficult childhood and experiences while deployed in Iraq produced a survivalist worldview and disillusionment that led him to make a bad decision. But he is also a veteran, a maturing man with future potential and a real desire to become a contributing member of society.

Novak grew up under difficult circumstances that left him to fend for himself at too young an age. He worked to overcome these obstacles by enlisting in the U.S. Army out of a need for structure and belonging, and a desire to serve. Novak accomplished his goals in the Army, becoming a member of the 82nd Airborne Division and an intelligence analyst despite not finishing high school. He served in Operation Iraqi Freedom but, like many war veterans, was disillusioned by the experience. Combined with the survivalist perspective forged in his childhood, this disillusionment led to a series of poor decisions ending with the underlying offense of identity theft. And

although the seriousness of the offense should not be understated, Novak's actions were taken without intent to cause financial harm to others, and no harm in fact resulted.

Moreover, Novak has been changed by his arrest, imprisonment and prosecution. He is deeply remorseful for his actions and acknowledges their serious nature.  He timely entered a guilty plea, he has taken responsibility for his actions as best he can, and he hopes to repay his debt to society by earning his college degree and ultimately starting a business.

For these reasons, as well as those set forth below, the Court should impose a sentence of less, but in any event no more, than 6 to 12 months' imprisonment, one year of supervised release, and a $100 special assessment.  This sentence is warranted under the U.S. Sentencing Guidelines Manual (2013) and is "sufficient, but not greater than necessary," to effect the sentencing purposes set forth in 18 U.S.C. § 3553(a).

## NOVAK'S BACKGROUND[1]

Novak was born in 1988 and spent much of his childhood living with his mother and step-father in an environment of neglect, drug abuse and squalor.  (*See* PSR ¶¶ 42–48.)  When he was 14 years old, Child Protective Services took custody of the younger siblings he was often responsible for, and Novak ran away from home to live with the family of a school classmate.  (*Id*. ¶¶ 47–49.)  Novak subsequently moved in with his father, who struggled with alcohol abuse and anger management issues, and who physically abused Novak.  (*Id*. ¶¶ 50–52.)  This led Novak to leave his father's home and

---

[1] The relevant facts of Novak's background are set forth accurately in the Presentence Investigation Report ("PSR").  (*See* PSR ¶¶ 42–110.)

to live again for a brief period with his friend's family, before ultimately becoming homeless.  (*Id.* ¶¶ 52–53.)  He was 17 years old at the time.  It was the summer of 2006, just before what should have been his senior year in high school.  (*Id.*)  Unable to return to school, Novak found a job and later was able to rent a room in a co-worker's home.  (*See id.* ¶¶ 52–55.)

In 2008, Novak moved to Virginia with a friend, rented a house and found a job.  (*Id.* ¶¶ 56–57.)  In late 2008, he obtained his General Equivalency Diploma and enlisted in the U.S. Army.  (*Id.* ¶¶ 58, 72, 76.)  He chose to serve out of a sense of duty and a longing for the opportunity and structure to mature and to "find" himself.  (*See id.* ¶ 75.)  Novak performed well in the Army.  He became an intelligence analyst despite the significant interruptions in his primary and secondary education.  (*Id.* ¶ 76.)  He was selected to try out for, and ultimately to join, the prestigious 82nd Airborne Division.  (*See id.* ¶¶ 80–81.)  And he ultimately earned multiple military awards.  (*Id.* ¶¶ 100–01.)

In 2009, Novak deployed to Iraq as part of Operation Iraqi Freedom.  (*See id.* ¶¶ 82–97.)  He worked long hours analyzing intelligence and providing information to superiors.  (*See id.* ¶¶ 84–96.)  He enjoyed the parts of his job that he felt were most helpful to keeping American troops alive, like providing information about improvised explosive devices ("IED") to troops in the field.  (*Id.* ¶ 87.)  On the other hand, he did not enjoy other parts of the job that he worried could lead to the injury or death of innocents.  (*Id.* ¶ 90.)

Novak also was involved in supporting American troops in combat operations.  (*Id.* ¶¶ 93–96.)  Although he found some of the work meaningful, it left him disturbed

3

and disillusioned about the American mission in Iraq.  (*Id.*)  For example, after helping American troops track and capture two insurgents, Novak learned that the insurgents—two poor Iraqis who had been paid by Al-Qaeda—were beaten and tortured by the Iraqi Army, and then later disappeared.  (*Id.* ¶¶ 95–96.)

Upon his return from Iraq, Novak sought a discharge as a conscientious objector on the basis of the feelings he had developed in opposition to U.S. activities in Iraq and Afghanistan.  (*Id.* ¶¶ 98–100.)  However, he was honorably discharged before a determination was made on his request.  (*Id.* ¶ 100.)  Novak then moved to Minnesota and began a period of service with the National Guard, as required under his original enlistment contract.  (*Id.* ¶¶ 100, 76.)

## OFFENSE-SPECIFIC FACTS

Novak was charged in a single-count Information with violating 18 U.S.C. § 1028(a)(7), (*see* Docket No. 23), which subjects to criminal punishment "[w]hoever"

> knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law . . . .

§ 1028(a)(7).  Novak entered into a plea agreement with the Government, under which the parties stipulated to the factual basis for a guilty plea, as well as to the parameters for the advisory sentencing guidelines calculations, among other things.  (*See* Docket Nos. 26 & 28 ("Plea Agmt.").)

The factual stipulation set forth in the plea agreement provides that, "[b]efore leaving Active Duty, the defendant obtained a personnel roster" including personal

identifying information ("PII") of "approximately 400 service members (*id*. ¶ 2(a)); and that, "[b]etween July and November of 2013, the defendant provided the personal information of approximately 98 service members to FBI undercover employees" (*id*. ¶ 2(b)). In exchange, the FBI provided Novak two payments of $2,000. (*Id*. ¶¶ 2(c)–(d).) Novak "provided the [PII] of the service members via email with the intent that the information would be used to create false identification documents" for "individuals not known to him," which would constitute a violation of 42 U.S.C. § 408(a)(7)(B). (*Id*. ¶ 2(e); *id*. ¶¶ 2(b)–(d).)

As the PSR correctly states, however,

> It should also be noted that any personal identifying information provided to the FBI undercover employee was in fact, only provided to the FBI. There was no evidence or any information to suggest that personal identifying information belonging to U.S. servicemen and women was released to anyone other than the FBI undercover employee, and none of the information was used for nefarious purposes or used to create false identification documents.

(PSR ¶ 13.) Under these facts, Novak entered a guilty plea to one count of identity theft in violation of 18 U.S.C. § 1028(a)(7).

## THE PURPOSES OF 18 U.S.C. § 3553(a) WOULD BE SERVED BY A SENTENCE BELOW OR AT THE BOTTOM OF THE ADVISORY GUIDELINE RANGE

"In determining an appropriate sentence, the district court ordinarily should determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the § 3553(a) factors justify a variance from this 'guidelines sentence.'" *United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir. 2010). In this case, the sentencing guidelines produce an advisory sentencing

range of 6 to 12 months' imprisonment.   Although the Government and Probation calculate a higher sentencing range, the Court should impose a sentence of no more than 6 to 12 months' imprisonment regardless of whether it accepts either of their positions. This is because the atypical, non-pecuniary nature of the offense warrants a downward departure under the sentencing guidelines and a downward variance under the § 3553(a) factors.

## I.      The Sentencing Guidelines Recommend an Advisory Sentencing Range of No More than 6 to 12 Months' Imprisonment.

Novak, the Government and Probation agree that § 2B1.1 of the sentencing guidelines governs the advisory sentencing calculation in this case.  (*See* PSR ¶ 20.) They also agree that the base offense level is 6, that a 3-level downward departure is warranted under § 3E1.1, and that the criminal history category is I.  (*See id*. ¶¶ 21, 39; Plea Agmt. ¶¶ 6(a), (d).)  There is disagreement, however, on application of three specific offense characteristics:   (1) the amount of "loss," if any, under § 2B1.1(b)(1); (2) the number of "victims," if any, under § 2B1.1(b)(2); and (3) whether possession of "access devices" or "means of identification" warrants an enhancement under § 2B1.1(b)(11).

Probation concludes that these offense characteristics increase the offense level to 18, which Probation reduces to 15 by operation of § 3E1.1, producing an advisory sentencing range of 18 to 24 months' imprisonment.  (PSR ¶¶ 22–33, 112.)   The Government argues that the total offense level is 21 by application of an 18-level enhancement for specific offense characteristics and a 3-level reduction under § 3E1.1,

resulting in an advisory range of 37 to 46 months' imprisonment.  (Plea Agmt. ¶¶ 6(b), (c), (f).)

The base offense level should be increased by only 6 levels, however, since only the § 2B1.1(b)(1) specific offense characteristic applies here, and that subsection calls for a 6-level enhancement.   Accordingly, after application of a 2-level reduction under § 3E1.1,[2] the total offense level is 10, and the advisory sentencing range is 6 to 12 months' imprisonment.  In addition, further downward departures are warranted under §§ 5K2.0, 5K2.11, and application note 20(C) of § 2B1.1.  Accordingly, the Court should sentence Novak to less than, but in any event no more than, 6 to 12 months' imprisonment.

### A.      No Enhancement Is Warranted Under § 2B1.1(b)(2).

Probation correctly concluded that no enhancement is warranted under § 2B1.1(b)(2) because there were no "victims," as that term is defined for purposes of this guideline.  (PSR ¶ 23.)  Section 2B1.1(b)(2) recommends increases in offense level based on the number of "victims," if any, of the offense.  § 2B1.1(b)(2).  A "victim" is defined as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." § 2B1.1 app. n.1.  As accurately explained in the PSR, the offense here involved no

---

[2] Because the applicable offense level prior to downward departures is 12, the additional 1-level reduction provided under § 3E1.1(b) is not available.  *See* § 3E1.1(b) (providing that defendants otherwise qualifying under this subsection do not receive a 1-level reduction if their pre-departure offense level is less than 16).

102052127v1

"victims" because no person "sustained an actual loss or suffered any bodily injury." (PSR ¶ 23.)

The Government does not contend any actual loss or bodily injury resulted.  (*See id.* add. at A.1.)  Instead, it invokes application note 4(E), which defines "victim" to include "(ii) any individual whose means of identification was *used* unlawfully or without authority."  § 2B1.1 app. n.4(E) (emphasis added).  The Government contends Novak "unlawfully or without authority" "used" each of the 400 sets of PII in his possession solely because "the government believes that the defendant used the service members' SSN[]s unlawfully and did so without authority."  (PSR add. at A.1.)  "'[V]ictim' for purposes of subsection (b)(2) [of § 2B1.1] is appropriately limited, however, to cover only those individuals whose means of identification are *actually used*." (emphasis added)).  U.S. Sentencing Guide Manual app. C amend. 726.

The unsupported assertion that "the government believes" Novak "used" the SSNs is not evidence that he, in fact, did.  Nor, therefore, does it provide the necessary factual predicate to conclude that each SSN in Novak's possession represents a "victim" under application note 4(E).  This is because "facts relied upon by the District Court at sentencing must be proved by a preponderance of the evidence [and] [t]he burden of proof is on the government with respect to the base offense level and any enhancing factors."  *United States v. Hammer*, 3 F.3d 266, 272 (8th Cir. 1993); *see also United States v. Fiorito*, No. 07-CR-0212(1), 2010 WL 1507645, at *11 (D. Minn. Apr. 14, 2010).

Probation correctly rejected the Government's contention that application note 4(E) calls for an enhancement.  "While it is true that [Novak] had approximately 400 service members' SSN[]s, there is no information to suggest that he *actually used* the SSN[]s."  (PSR add. at A.1 (emphasis added)).  "There was no evidence or any information to suggest that personal identifying information belonging to U.S. servicemen and women was released to anyone other than the FBI undercover employee, and none of the information was used for nefarious purposes or used to create false identification documents."  (*Id.* ¶ 13.)  And although the SSNs of 98 individuals "were sold to an undercover FBI employee," they "never left the FBI employee's possession, and none of the SSN[]s were sold or used by anyone other than an undercover FBI employee."  (*Id.* add. at A.1.)

In the absence of any evidence Novak "actually used" any of the PII he possessed or transferred, application note 4(E) is inapposite.  Consequently, the Court should accept Probation's conclusion that a "victim" enhancement is not warranted under § 2B1.1(b)(2).

**B.     Section 2B1.1(b)(1) Calls for a 6-Level Enhancement.**

Novak, the Government and Probation disagree about the application of § 2B1.1(b)(1), which recommends offense level enhancements based on the amount of actual or intended "loss."  Probation recommends a 10-level increase because the "loss" was $200,000 while the Government contends a 12-level increase applies on the basis of its assertion that the loss exceeded $200,000.  (PSR ¶¶ 2, 22.)  Neither is correct.

Although all parties agree there was no actual or intended "loss," application note 3(F)(i) establishes a presumption of a $49,000 "loss," resulting in a 6-level increase.

For purposes of § 2B1.1(b)(1), "loss is the greater of actual or intended loss." § 2B1.1 app. n. 3(A).   However, this guideline applies a presumption that every "unauthorized access device" for which a defendant is convicted, in fact, caused or was intended to cause a $500 "loss." *Id*. app. n. 3(F)(i).  Specifically, application note 3(F)(i) provides that "[i]n a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device." *Id.* app. n. 3(F)(i).   The parties agree that each set of PII constitutes an "unauthorized access device."  *See id*. app. n. 3(F)(i) (defining "unauthorized access device" by reference to app. n. 10(A)); *id*. app. n. 10(A) (referencing 18 U.S.C. § 1029(e)(3)); 18 U.S.C. § 1029(e)(3) (defining "unauthorized access device"); *id*. § 1029(e)(1) (defining "access device").

Probation and the Government both conclude that the $500 presumptive "loss" amount applies to each set of PII that Novak possessed.  Probation concludes this would produce a "loss" amount of $200,000, resulting in a 10-level increase in the offense level, since the parties stipulated that Novak possessed the PII of "approximately 400 service members."  (Plea Agmt ¶ 2(b); *see also* PSR ¶¶ 8, 22.)  But the Government contends that "the offense level should be increased by 12 levels because the loss attributable to the defendant exceeded $200,000."   (Plea Agmt. ¶ 6(b).)   The plea agreement's stipulation that Novak possessed "approximately 400" sets of PII, however, does not

10

permit the Government to carry its burden to prove he possessed *more than* 400 sets.  *See United States v. Wells*, 127 F.3d 739, 745 (8th Cir. 1997) ("The burden of proving the extent of loss falls on the Government, who must prove the extent of the loss by a preponderance of the evidence."); *see also United States v. Hartstein*, 500 F.3d 790, 796 (8th Cir. 2007) (vacating sentence because Government did not prove disputed loss amount and victim count on which sentence was based).  Moreover, the Government's stipulation also precludes it from contending or presenting evidence that Novak possessed more than "approximately 400" sets of PII.  *See United States v. Lara*, 690 F.3d 1079, 1081–83 (8th Cir. 2012) (vacating sentence because it was based on Government's evidence of a higher drug quantity than stipulated to in plea agreement).  Therefore, if the $500 presumptive loss applies to each set of PII Novak possessed, § 2B1.1(b)(1) would increase the offense level by 10 (as Probation concludes), not 12 (as the Government claims).

However, the $500 presumptive "loss" amount provided for in application note 3(F)(i) applies, not to all 400 sets of PII Novak possessed, but only to the subset of 98 that he admitted to transferring in violation of 18 U.S.C. § 1028(a)(7).  The parties stipulated that, "via email, the defendant provided the personal information belonging to seven (7) service members to [the] FBI . . . . with the intent to obtain false identification documents for individuals not known to him" (Plea Agmt. ¶ 2(b)); and that, "via email, the defendant provided the personal information belonging to an additional 44 service members" and "an additional 47 service members to [the FBI] . . . . believing the personal

information would be used unlawfully to create false identification documents for individuals not known to him" (*id.* ¶¶ 2(c), (d)).

With respect to the remaining 302 sets of PII that Novak possessed but did not transfer, however, the plea agreement is silent on intent, which is a requisite element under 18 U.S.C. § 1028(a)(7).  (*See id.* ¶ 2(a).)  In the absence of evidence of intent, the plea agreement does not contain the factual basis to conclude that Novak pled guilty to violating § 1028(a)(7), except with respect to the 98 sets of PII he transferred with the intent required by that statute.  Accordingly, applying a $500 "loss" amount to the 98 "unauthorized access devices" "involv[ed]" in this case for purposes of application note 3(F)(i), results in a presumptive "loss" amount of $49,000.  The Court therefore should find that § 2B1.1(b)(1) provides for an enhancement of 6 levels, as opposed to 10 or 12 levels.  *See* § 2B1.1(b)(1)(D) (applicable to "loss" amounts exceeding $40,000 but not $70,000).

### C.    No Enhancement Is Warranted Under § 2B1.1(b)(11).

The 2-level enhancement that Probation recommends under § 2B1.1(b)(11) is not warranted.  Probation recommends this enhancement on the basis that "the defendant possessed 400 SSN[]s, which the Eighth Circuit has determined to be an access device and/or means of identification."  (PSR add. at A.2; *see also id.* ¶ 25 (recommending this enhancement because "the defendant possessed 400 access devices and/or means of identification").)  Whether an SSN constitutes an "access device" or "means of identification" is irrelevant, however, because § 2B1.1(b)(11) does not apply to the *possession* of "access devices" or "means of identification."

Section 2B1.1(b)(11) calls for an enhancement for "possession" only in the following circumstances:  "If the offense involved (A) the possession . . . of any (i) device-making equipment, or (ii) authentication feature; . . . or [C](ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification."  § 2B1.1(b)(11).  None of these circumstances is present here.  Neither Probation nor the Government contends Novak possessed any "device-making equipment" or "authentication feature."  *Id*.  Nor do they contend that the means of identification Novak possessed were "unlawfully . . . produced from, or obtained by the use of, another means of identification."  *Id*.

Probation's rationale—that "the defendant possessed 400 access devices and/or means of identification" (PSR ¶ 25)—therefore does not support its recommendation of a 2-level enhancement under § 2B1.1(b)(11).  Consequently, the Court should decline this recommendation, and find that the total offense level prior to departures is 12.

## II.  Downward Departures Are Warranted Under §§ 3E1.1, 5K2.0 and 5K2.11, and Under Application Note 20(C) of § 2B1.1.

### A.  A 3-Level Downward Departure Is Warranted For Novak's Acceptance of Responsibility.

Probation recommends a 2-level reduction under § 3E1.1(a) because Novak "has clearly demonstrated acceptance of responsibility," and an additional reduction of 1 offense level under § 3E1.1(b) because Novak "has assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of the intention to enter a plea of guilty."  (PSR ¶¶ 31–32.)  The Government does not

13

dispute these departures.  (*See id.*)  The Court therefore should apply § 3E1.1 and reduce the offense level calculated under § 2B1.1 by up to 3 levels. [3]

### B.    The Unique, Non-Pecuniary Nature of the Offense Warrants Additional Downward Departures Under §§ 5K2.0, 5K2.11 and Application Note 20(C) of § 2B1.1.

In addition, the Court also should depart downward for the independent reason that this case falls outside the "heartland" of § 2B1.1 and is atypical of the offense of identity theft because pecuniary loss was neither the object nor the result of the underlying conduct.

The Sentencing Commission has stated that it

> intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b).  To determine whether a departure is warranted on this basis, "the sentencing court should consider what features of the case potentially take it outside the guidelines' heartland and make it a special or unusual case; the court should also consider whether the Sentencing Commission has forbidden, encouraged, or discouraged departures based on any such features."  *United States v. Never Misses A Shot*, 715 F.3d 1048, 1052 (8th Cir. 2013).

---

[3] The 1-level downward departure provided for under § 3E1.1(b) is available only if the total offense level prior to departures is at least 16.  *See* § 3E1.1(b).  Since the pre-departure offense level is 12, this reduction is not available and the Court should depart downward by 2 levels under § 3E1.1(a).  In the event the Court determines that the offense level is at least 16, however, it should apply the additional 1-level reduction provided for in § 3E1.1(b).

Here, the atypical, non-pecuniary nature of this case warrant downward departures on the basis of the "encouraged" factors set forth under §§ 5K2.0, 5K2.11 and application note 20(C) of § 2B1.1.[4]   Application note 20(C) of § 2B1.1 calls for a downward departure because the $500 loss amount attributed to each set of PII under application note 3(F)(i) "substantially overstates" the "loss caused or intended," which "is a principal factor in determining the offense level under this guideline." *See* § 2B1.1 app. n. 20(C); *id*. at cmt. background.  The presumption of a $500 loss amount would punish Novak for as much as a $200,000 loss—increasing his offense level by up to 10 levels—despite the absence of any evidence of actual or intended loss.  (*See* PSR ¶ 22).  A downward departure is also warranted under § 5K2.0 because the non-pecuniary nature of the underlying conduct is a circumstance that is not identified by, and "of a kind not adequately taken into account" in, application note 3(F)(i).   *See* § 5K2.0(a)(2)(B). Finally, § K2.11 also calls for a downward departure because, in the absence of any actual or intended loss, the underlying conduct did not "cause or threaten the harm or evil sought to be prevented by the law proscribing the offense" of identity theft.  *See* § 5K2.11.

> 1.   <u>A Downward Departure Is Warranted Under Application Note 20(C) of § 2B1.1.</u>

The absence of any actual or intended loss takes this case outside the "heartland" of § 2B1.1 and warrants a downward departure under application note 20(C).  In its

---

[4]   Novak hereby moves for a downward departure under these sentencing provisions.  (*See generally* Plea Agmt ¶ 6(i) ("The parties reserve the right to make a motion for departures from the applicable Guidelines range . . . .").)

commentary to the guideline, the Sentencing Commission made clear that the focus of § 2B1.1 is "loss caused or intended" to victims:

> [O]rdinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the ***loss caused or intended*** by their crimes.  Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

§ 2B1.1 cmt. background (emphasis added).

The Commission's choice to "measure . . . the seriousness of the offense and the defendant's relative culpability" by reference to the "loss caused or intended" is reflected in subsection (b)(1) of § 2B1.1.  That subsection recommends a wide range of offense-level enhancements—and thus a wide range of sentences—based on the amount of actual or intended pecuniary loss.  § 2B1.1(b)(1).  While actual or intended losses that are minimal will not increase a defendant's offense level, large losses can trigger increases of up to 30 offense levels.  *See id*.  In the case of a defendant with a criminal history category of I, for example, the loss amount alone can increase the base sentencing range from between 0 and 6 months to between 15 and nearly 20 years' imprisonment.  *See* § 2B1.1(a)(2) (setting a base offense level of 6); U.S. Sentencing Guidelines Manual sentencing tbl. (establishing sentencing range of 0 to 6 months for offense level 6 and 188 to 235 months for offense level 36).

The Sentencing Commission recognized that its election to adopt loss as "a principal factor in determining the offense level under" § 2B1.1 may in some cases result in an overstated offense level.  § 2B1.1 cmt. background.  Accordingly, the Commission

established as an "encouraged" basis for downward departures "cases in which the offense level determined under [§ 2B1.1] substantially overstates the seriousness of the offense." § 2B1.1 app. n. 20(C).  *See, e.g.*, *United States v. Kalili*, 100 F. App'x. 903, 906 (4th Cir. 2005) (affirming 5-level downward departure where defendant "did not significantly profit from" offense); *United States v. Keller*, No. 3:04-CR-233-G, 2005 WL 6192897 at *6 (N.D. Tex. Oct. 17, 2005) (departing downward because defendant's intent was "significantly different [from] the usual fraud candidate"); *United States v. Forchette*, 220 F. Supp. 2d 914, 925–27 (E.D. Wis. 2002) (departing downward where defendant did not devise scheme and profited minimally).

Here, the Court should depart downward on the basis of this "encouraged" factor. This case falls outside the "heartland" of § 2B1.1 because it does not involve "a principal factor" used to "measure . . . the seriousness of the offense and the defendant's relative culpability" under the guideline: "loss caused or intended." § 2B1.1 cmt. background. Neither the PSR nor the parties' factual stipulation indicates that Novak intended to or actually caused loss through his possession of the 400 sets of PII at issue here.  (*See* Plea Agmt. ¶¶ 2(a)–(e); PSR ¶¶ 8–11, 13; *id.* add. at A.1.)  The plea agreement and PSR both state only that Novak transferred the PII to the FBI "with the intent to obtain false identification documents" or "believing the personal information would be used unlawfully to create false identification documents."  (Plea Agmt. ¶¶ 2(b)–(d); PSR ¶¶ 9–10.)

In the absence of any evidence of actual or intended loss, presuming that each of the 98 transferred sets of PII caused or was intended to cause $500 in loss "substantially

overstates the seriousness of the offense." § 2B1.1 app. n. 20(C). Novak would be punished for causing or intending to cause a $49,000 loss—doubling his base offense level of 6—solely on the basis of this unwarranted presumption. (*See supra* Part I.) The offense level would be even more overstated under the view that the $500-loss presumption also applies to the remaining 302 sets of PII that Novak possessed but did not transfer. (*See supra* Part I.B.) In that case, Novak would be punished for a $200,000 loss—increasing his offense level by 10 levels—despite the absence of any evidence of actual or intended pecuniary loss. (*See* PSR ¶ 22). In either circumstance, the presumed loss amount results in an offense level that "substantially overstates the seriousness of the offense." § 2B1.1 app. n. 20(C).[5] Consequently, a downward departure is warranted under application note 20(C) of § 2B1.1.

---

[5] That this case falls outside the "heartland" of § 2B1.1 is further demonstrated by the dearth of similar cases in which, like here, no loss occurred or was intended. The typical case under § 2B1.1 involves identity theft or fraud in which the measure of "loss" is derived from the pecuniary loss actually caused or intended. *See, e.g.*, *United States v. Jenkins-Watts*, 574 F.3d 950, 956 (8th Cir. 2009) (credit fraud scheme where loss amounts exceeded $400,000 and $120,000 for respective defendants who chose victims based on credit scores, created counterfeit Kansas driver's licenses, applied for instant credit using fraudulent identification, purchased high-dollar items, and sold those items for significantly less than retail value); *United States v. Lyons*, 556 F.3d 703 (8th Cir. 2009) (defendants knowingly purchased counterfeit driver's licenses and credit cards and used them to purchase merchandise in excess of $5,000 over a two-week period); *United States v. Hines*, 472 F.3d 1038, 1039 (8th Cir. 2007) (defendant fraudulently obtained credit using victim's name, driver's license, and social security number and defrauded numerous retailers); *United States v. Sample*, 213 F.3d 1029, 1030 (8th Cir. 2000) (defendant procured personal information from friends and acquaintances, then used the personal information to open bank accounts and credit cards with which she made numerous purchases in excess of $70,000).

Our research has identified only one other case in which a defendant was sentenced under § 2B1.1 (or § 2F1.1, which was incorporated into § 2B1.1 in 2001, *see* § 2F1.1 historical n.) for violating 18 U.S.C. § 1028 in the absence of any indication of

2.      A Downward Departure Also Is Warranted Under §§ 5K2.0 and 5K2.11.

In addition, the unique, non-pecuniary nature of the underlying conduct here warrants a downward departure under §§ 5K2.0 and 5K.211.  Section 5K2.0 authorizes downward departures from the applicable advisory guideline range "based on circumstances of a kind not adequately taken into consideration" by the applicable sentencing guideline.  § 5K2.0(a)(2).  And § 5K2.11 provides for downward departures based on "Lesser Harms," such as "conduct [that] may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue."  § 5K2.11.

The $500 presumptive loss amount that serves as the primary determinant of the advisory sentencing range here was established by the Sentencing Commission in response to Congress's enactment of the Identity Theft and Assumption Deterrence Act of 1998 ("ITADA"), Pub. L. No. 105-318, and the Wireless Telephone Protection Act of 1998 ("WTPA"), Pub. L. 105-172.  *See* U.S. Sentencing Guide Manual app. C amend. 596.  In enacting these laws and the resulting amendment of the Sentencing Guidelines, neither Congress nor the Sentencing Commission contemplated the circumstances present in this case.

---

actual or intended loss.  In that case, *United States v. Agarwal*, the Third Circuit affirmed a conviction under § 1028(a)(7) where the defendant's conduct was limited to purchasing a counterfeit "means of identification" "with which he hoped to gain access to various campus facilities."  314 F. App'x 473, 473–74 (3rd Cir. 2008).  Although neither the Third Circuit's opinion nor documents publicly available on the district or appellate courts' dockets provides the guideline calculations adopted in *Agarwal*, that the sentence imposed was limited to two years of probation is telling.  *Id* at 474.

The IDATA was aimed at preventing the financial loss and non-monetary harm suffered by victims of identity theft.   It created 18 U.S.C. § 1028(a)(7), the statutory provision to which Novak pled guilty in this case.

> The ITADA amended the fraud chapter of title 18 of the United States Code to create a new crime prohibiting the unlawful use of personal identifying information . . . .   Identity fraud involves the misappropriation of another person's personal identifying information.   Criminals use this information to establish credit in their name, run up debts on another person's account, or take over existing financial accounts.

*United States v. Williams*, 355 F.3d 893, 898 (6th Cir. 2003).   The WTPA, on the other hand, directed the Commission to "review and amend the Federal sentencing guidelines and the policy statements of the Commission, if appropriate, to provide an appropriate penalty for *offenses involving the cloning of wireless telephones* (including offenses involving an attempt or conspiracy to clone a wireless telephone)."   Pub. L. 105-172 (emphasis added).

In setting the presumptive $500 loss amount in response to the IDITA and WTPA, the Commission did not indicate an intent to punish defendants who, like Novak, committed identity theft without harboring any intent to cause loss and without causing any loss.   *See* U.S. Sentencing Guidelines Manual app. C amend. 596.   The Commission concluded that Congress's directive "to review the extent to which the value of the loss caused by the offenses . . . is an adequate measure for establishing penalties" called for an increase from $100 to $500 in the minimum loss amount attributable to cloned wireless telephones and other "unauthorized access devices."   *Id.* (quotation omitted).   The Commission based this interpretation solely on its assertion that "the Commission's

20

research and data supported increasing the minimum loss amount . . . from $100 to $500 per access device." *Id.* It did not explain what this research and data established, or whether it had considered cases involving neither actual nor intended loss. *See id.*

In setting the presumptive $500 loss amount under § 2B1.1, therefore, the Sentencing Commission did not "adequately take[] into consideration" the unique, non-monetary nature of offenses such as this one. *See id.*; § 2B1.1 application n. 3(F)(i); *see also United States v. Lighthall*, 389 F.3d 791, 795 (8th Cir. 2004) ("'In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.'" (quoting 18 U.S.C. § 3553(b)). In this circumstance, a downward departure is warranted under § 5K2.0. Furthermore, the absence of any indication of an intent to cause loss differentiates the underlying conduct here from "the harm or evil sought to be prevented by" 18 U.S.C. § 1028(a)(7)—namely, identity thieves' "use of [personal identifying] information to establish credit in their name, run up debts on another person's account, or take over existing financial accounts." *See Williams*, 355 F.3d at 898. Consequently, a downward departure is also warranted under § 5K2.11.

### III. The Purposes of 18 U.S.C. § 3553(a) Would Be Served by a Sentence Below or at the Bottom of the Applicable Advisory Guideline Range.

The factors set forth in 18 U.S.C. § 3553(a) that must be considered by the Court before sentencing also support a sentence of no more than 6 to 12 months' imprisonment. Those factors are:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with [education and medical treatment];

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range [established by the Sentencing Guidelines];

    (5)    any pertinent policy statement [issued by the Sentencing Commission] . . . ;

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In light of these factors, a sentence below or at the bottom of the advisory guideline range would effect § 3553(a)'s command to "impose a sentence that is sufficient, but not greater than necessary, to" serve the purposes of criminal sentencing.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The offense warrants a sentence below, but no more than, the advisory sentencing range provided for under the Sentencing Guidelines.  No pecuniary or non-monetary harm was inflicted on any person whose PII was involved, or on any other person.  As

Probation concluded, "[t]here was no evidence or any information to suggest that personal identifying information belonging to the U.S. servicemen and women was released to anyone other than the FBI undercover employee, and none of the information was used for nefarious purposes or used to create false identification documents." (PSR ¶ 13.)  While the possession and transfer of PII is undoubtedly a serious offense, Novak's actions and his lack of intent to cause harm differentiate his conduct from the financial fraud that is the goal of typical identity theft offenses and the focus of the statute of conviction.  *See Williams*, 355 F.3d at 898.

Novak's history and characteristics further support a sentence below or at the bottom of the advisory sentencing range.  His actions were those of a young, first-time offender who was struggling with the disillusionment caused by his experiences serving the U.S. Army in the theatre of war.  This disillusionment combined with a survivalist worldview formed by the circumstances of his childhood to produce a terrible decision. That single decision, however, does not and should not define Novak.

Prior to the offense, Novak had overcome significant odds to join and serve in the Army.  His childhood was one of significant difficulty and uncertainty, which left him foundering for a sense of belonging and purpose.  He joined the U.S. Army out of a sense of duty, and found in it the structure and stability denied him as a child.  Like so many veterans, however, his idealization of military service was upended by the wartime experience.  That his disillusionment combined with his survivalist worldview to produce in him a fear of his government is highly unfortunate, but perhaps not wholly surprising.

Novak's conduct since the offense, however, reflects a young man who has learned from the experience.  He acknowledged the seriousness nature of his conduct and timely entered a guilty plea.  He remains a young man with real potential to become a contributing member of society.  Upon release, he intends to resume his post-secondary coursework, obtain a four-year degree and start a business.  In sum, Novak's history and potential, as well as the unique nature of the offense, are consistent with those of an individual who should be sentenced below or at the bottom of the advisory sentencing range.

**B.     The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

In this case, a downward variance from the advisory guidelines range would result in "a sentence sufficient, but not greater than necessary, to . . . reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  18 U.S.C. § 3553(a).  The sentencing guidelines "provide a framework or starting point—a basis, in the commonsense meaning of the term—for the judge's exercise of discretion."  *Freeman v. United States*, 131 S.Ct. 2685, 2692 (2011).  "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).  Rather, the guidelines "'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

In sentencing a defendant, the court must make an "individualized assessment based on the facts presented," *Gall v. United States*, 552 U.S. 38, 50 (2007), engaging in a "holistic" consideration of the statutory sentencing factors, *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).  The court's final determination must meet § 3553(a)'s "overarching instruction" to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, *Kimbrough*, 552 U.S. at 111, including "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a).  This directive, known as the parsimony principle, warrants a downward variance in this case. (*See generally* Plea Agmt ¶ 6(i) ("The parties reserve the right to argue for a sentence outside the applicable Guidelines range."))

Section 2B1.1 does not satisfy the parsimony principle here because it overstates the offense level on the basis of factors that are absent from the underlying conduct, namely, actual or intended loss.  *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427–28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds.").  As discussed above, application note 20(C) of § 2B1.1 increases the applicable offense level by as much as 10 levels solely on the basis of a presumption that every set of PII involved in the underlying offense inflicted, or was intended to inflict, a $500 loss.  (*See supra* Part I.B.)  As a result, Novak would be

punished for causing or intending to cause a $200,000 loss despite the total absence of evidence he intended to cause any loss.

The Sixth Circuit recently explained the conflict between the $500 loss presumption of § 2B1.1, which is merely advisory, and the parsimony principle of § 3553(a), which is controlling:

> Theoretically, the $500 fictional amount should have to pass muster under the parsimony provision of 18 U.S.C. § 3553(a), which commands the court that it "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of punishment set out in the statute.  In this case, for example, the special rule increased Lyles's punishment by eight levels, from 70–87 months to 140–175 months.  A rule requiring courts to automatically double a sentence based on a fictional loss multiplier is a rule that may well produce a sentence greater than necessary to achieve punishment's aims.

*United States v. Lyles*, 506 F. App'x 440, 444 (6th Cir. 2012).

Although the defendant's failure to raise this issue prevented the Sixth Circuit from deciding it in *Lyles*, the court nevertheless explained why the Sentencing Commission's election of a $500 loss presumption should not be afforded deference:

> The $500 rule first appeared in the Guidelines in 2000.  The Commission added what is now § 2B1.1 cmt. n. 3(F)(i) after the Wireless Telephone Protection Act instructed it to "provide an appropriate penalty for offenses involving the cloning of wireless telephones."  Pub. L. No. 105–172, § 2(e), 112 Stat. 53, 55 (1998).  The Commission did not limit its change to wireless-telephone cloning, but amended the commentary to encompass all access devices. It explained that "the Commission's research and data supported increasing the minimum loss amount, previously provided only in § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft), from $100 to $500 per access device," U.S.S.G. Supp. App. C, Amend. 596, but the Commission did not elaborate upon the substance of its "research and data."

*Id.*

As Judge Underhill of the Second Circuit has observed, "[t]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.  As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."  *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) (citing *Kimbrough*, 552 U.S. at 109–10).  Although the loss amount is intended to "measure . . . the seriousness of the offense and the defendant's relative culpability," § 2B1.1 background cmt., courts have recognized that the loss amount can be—as in this case—"a kind of accident" and thus "a relatively weak indicator of . . . moral seriousness . . . or the need for deterrence," *Emmenegger*, 329 F. Supp. 2d at 427–28; *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[]").

Here, the Court should follow the guidance set forth by the Second and Sixth Circuits.  The $500 loss presumption is based on a Congressional directive that is not applicable in this case and on "research and data" the Commission did not describe.  In this case, the loss presumption is the principal determinant of the applicable offense level despite the absence of any evidence of actual or intended loss.  As a result, it produces an offense level that is "greater than necessary . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a).  Therefore, because the loss presumption is incompatible in this case with the

parsimony principle of § 3553(a), the Court should exercise its discretion to vary downward from the advisory sentencing range.

**C.    The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant**

A sentence below or at the bottom of the advisory guideline range also would afford adequate deterrence and protect the public from the risk of recidivism.   The underlying conduct here is atypical for the offense of identity theft in that no loss was intended or inflicted.   In light of this fact, the deterrent effect that Novak's punishment could have on other would-be identity thieves would be minimal regardless of how long a prison sentence the Court imposes.   Moreover, a sentence of no more than 6 to 12 months' imprisonment is not only just, reflective of the seriousness of the crime, and adequate to promote respect for the law, it is also more than sufficient to protect the public from the risk that Novak will re-offend.   Novak has never before been convicted of anything but a traffic citation.   He no longer has access to confidential information, nor the inclination to recidivate or to commit any offense, no matter how minor.   And his experience in this matter, including being imprisoned since December 2013, has fundamentally changed him for the better.   For this reason, the Court should impose a sentence of no more than 6 to 12 months' imprisonment.

## CONCLUSION

Novak is a young man with promise who overcame significant odds to join and serve in the U.S. Army.   He is also a veteran of Operation Iraqi Freedom who became disillusioned by his experiences in the theatre of war, leading to a terrible decision.   That

decision resulted in a federal conviction and its attendant stress and remorse, but it should not condemn Novak to a lengthy prison sentence.  His actions, while serious, reflect a poor choice by a still-maturing war veteran and not a decision driven by a desire to hurt others.  The Court should therefore impose a sentence of (1) no more than 6 to 12 months' imprisonment, (2) one year of supervised release, and (3) a special assessment of $100.

KEITH MICHAEL NOVAK
By his attorneys,


/s/ Jeffrey G. Mason
W. Anders Folk (#311388)
Jeffrey G. Mason (#390041)
**STINSON LEONARD STREET LLP**
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone:  (612) 335-1500
Facsimile:  (612) 335-1657
anders.folk@ stinsonleonard.com
jeffrey.mason@ stinsonleonard.com

*Attorneys for Keith Michael Novak*

102052127v1

**CERTIFICATE OF SERVICE**

I, Jeffrey G. Mason, do hereby certify that this document has been electronically filed with the Clerk of Court using CM/ECF system, that a copy was made available to all electronic filing participants, and that a copy was served electronically to the United States Pretrial Service Office, all on July 30, 2014.

/s/ Jeffrey G. Mason

Jeffrey G. Mason (#390041)

102052127v1